AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
Dec 03 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

| United States of America | ) |
|---|---|
| v. | ) |
| Jesus Ascencio RAMIREZ and Francisco Tomas REUS | ) Case No. 3-20-mj-71762 MAG |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  12/2/2020  in the county of  San Francisco/San Mateo  in the  Northern  District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B)(ii)(II) | Attempt to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B)(ii)(II). Max penalities: Mandatory minimum of 5 years' imprisonment, up to 40 years'l $5 mil fine; at least 4 years' supervised release, up to lifetime supervised release; $100 special assess.; forfeiture; restitution; potential deportation or other immigration consequences. |

This criminal complaint is based on these facts:

Please see the attached affidavit of DEA Special Agent Colin Hart

Approved as to form _/s Joseph Tartakovsky_____
AUSA Joseph Tartakovsky

☑ Continued on the attached sheet.

s/
*Complainant's signature*

Colin Hart, DEA Special Agent
*Printed name and title*

Sworn to before me on the phone and signed in my presence.

Date: 12/3/2020

*Judge's signature*

City and state:  San Francisco, California    Hon. Joseph C. Spero, U.S. Magistrate Judge
*Printed name and title*

Print | Save As... | Attach | Reset

## AFFIDAVIT OF DEA SPECIAL AGENT COLIN HART
## IN SUPPORT OF CRIMINAL COMPLAINT

I, Colin Hart, hereby duly sworn, declare and state:

## INTRODUCTION

1. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I make this Affidavit in support of a Criminal Complaint charging **Jesus Ascencio RAMIREZ** and **Francisco Tomas REUS** each with one count of attempt to knowingly and intentionally possess with intent to distribute a controlled substance, namely, 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B)(ii)(II).

3. The facts in this Affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses. In addition, where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

4. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not included each and every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support probable cause for a criminal complaint.

## AGENT BACKGROUND

5. I am a Special Agent ("SA") employed by the U.S. Drug Enforcement

Administration ("DEA") and have been so employed since December 2019.  I am currently assigned to the San Francisco Field Division.  I am authorized and am presently assigned to investigate violations of the Controlled Substance Act ("CSA"), Title 21 of United States Code, and other violations of federal law.

6. Prior to becoming a DEA Special Agent, I was a legal analyst with Verizon Wireless.  In this capacity, I assessed and processed legal inquiries from various local, state, and federal law enforcement agencies.  I also conducted cellular phone data extractions, real-time GEO tracking, and installed location-tracking programs to assist in Verizon Wireless's mission to complement the emergency services requests of various law enforcement agencies across the country.

7. During my employment with the DEA, I have received nineteen weeks of full-time formalized education, training, and experience at the DEA Basic Agent Training Academy in Quantico, Virginia.  This education, training, and experience included but is not limited to drug detection, drug interdiction, money laundering techniques, and schemes and investigation of individuals and organizations involving the smuggling, cultivation, manufacturing, and illicit trafficking of controlled substances.  As a Special Agent, I have participated in multiple narcotics investigations. I have debriefed defendants, confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking organizations.  I also have participated in many aspects of drug investigations including but not limited to telephone toll analysis, records research, and physical and electronic surveillance.  I have participated in the execution of several federal search and arrest warrants that resulted in the arrest of suspects and seizure of narcotics.  In addition, I have attended a training course regarding drug smuggling and interdiction.

8. I have also had the opportunity to speak extensively with other experienced law enforcement officers and cooperating individuals about the packaging and preparation of narcotics, methods of operation, and security measures often employed by drug traffickers.  I have examined documentation of various methods in which illicit drugs are smuggled, transported, and

distributed.  Throughout these investigations, I have also gained expertise in the use of a variety of law enforcement techniques, including the application and use of wire and electronic interceptions, confidential sources and undercover agents, surveillance techniques, and various other types of electronic techniques, such as body wires and transmitters.  Additionally, I have gained knowledge and expertise in the use and analysis of data from pen register and trap-and-trace devices, toll records, traditional business records (including financial records and utility records) and nontraditional records kept by drug traffickers, such as pay-and-owe sheets documenting deliveries of and payments for narcotics.  I have also gained knowledge and expertise in the collection and identification of drug evidence and the analysis and interpretation of taped conversations.

9. Through my training, education, experience, and my conversations with other agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of mobile telephones and mobile telephone applications, Internet applications, social media applications, as well as narcotics traffickers' use of numerical codes and code words to conduct business.  I have become familiar with narcotics traffickers' methods of operation, including but not limited to the manufacturing, distribution, storage, and transportation of narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and launder drug proceeds.

## APPLICABLE LAW

10. Title 21, United States Code, § 841(a)(1) provides, in relevant part, that "it shall be unlawful for any person knowingly or intentionally…to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Specifically, 21 U.S.C. § 841(b)(1)(B)(ii)(II) provides that any person who violates § 841(a)(1) in a case involving "500 grams or more of a mixture or substance containing a detectable amount of…cocaine, its salts, optical and geometric isomers and salts of isomers" is subject to a mandatory minimum term of imprisonment of five years.

11. 21 U.S.C. § 846 provides that "[a]ny person who attempts or conspires to commit

any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

### STATEMENT OF PROBABLE CAUSE

12. As set forth below, there is probable cause to believe that RAMIREZ and REUS violated Title 21, United States Code, §§ 846, 841(a)(1), (b)(1)(B)(ii)(II), by attempting to knowingly and intentionally possess with intent to distribute cocaine.

13. The DEA has been conducting a criminal investigation that targets the drug trafficking activities of Jesus Ascencio RAMIREZ and his organization. In November 2020, the DEA received and corroborated information from a DEA Confidential Source (hereinafter, "CS"[1]), indicating that RAMIREZ is a multi-kilogram cocaine purchaser in the San Francisco Bay Area (and therefore within the Northern District of California).

14. According to the CS, in November 2020, he/she was informed that an individual referred to as "Primo" (later identified as RAMIREZ)[2] was looking to purchase kilogram quantities of cocaine. This information came from a narcotics deal broker in Mexico, only identified as "Mapache," who used telephone number, 52-667-321-9397. ("Mapache" still has not been identified.) The CS advised myself and other agents that "Mapache" was looking to broker a deal between RAMIREZ and the CS in the San Francisco Bay Area. "Mapache" then provided the CS with RAMIREZ's telephone number, 650-471-1115.

15. On November 12, 2020, the CS told agents that, earlier that day, he/she contacted

---

[1] CS is a paid DEA informant who has been cooperating with the DEA since 2005 for monetary compensation. The CS was arrested for alien smuggling in 2005 and the prosecution was declined. Also in 2005, the CS was charged with amphetamine sales and the charge was dismissed. The CS has provided information leading to numerous federal, state, and local arrests and convictions. The CS has proven to be a consistently reliable source of information because much of his/her information has been independently corroborated, including through recorded conversations, toll records, and surveillance. To my knowledge, CS's information has not been found to be false or misleading. CS is not known to be a defendant for any pending charges.

[2] RAMIREZ was identified through subpoenaed telephonic subscriber records, open-source and law-enforcement databases, and surveillance and vehicle registration information.

RAMIREZ, on telephone number 650-471-1115, to discuss a narcotics sale.[3] According to the CS, during that conversation between RAMIREZ and the CS, RAMIREZ advised the CS that he was looking to buy 5 "T-shirts" ("camisas blancas" in Spanish), which the CS understood to mean 5 kilograms of cocaine. RAMIREZ further explained to the CS (according to the CS) that he had a deal in place to purchase 5 kilograms of cocaine from individuals in Los Angeles, California, but stated that these individuals were difficult to work with and their deal was no longer happening. According to the CS, RAMIREZ agreed to pay $33,000 per kilogram of cocaine. The CS also stated that RAMIREZ told the CS that he, RAMIREZ, had a customer seeking to buy 5 kilograms of cocaine, so that he, RAMIREZ, needed to obtain cocaine as soon as possible. In addition, the CS stated to agents that RAMIREZ told the CS that he, RAMIREZ, wanted to conduct an in-person meeting to discuss transaction details before any purchase. The CS stated to agents that he/she advised RAMIREZ, at the end of the conversation between the CS and RAMIREZ, that his/her partner in San Francisco would contact RAMIREZ to coordinate the 5 kilogram cocaine transaction.

16. On November 13, 2020, a DEA Special Agent ("SA") acting in an undercover capacity (hereafter "UC-1"), contacted RAMIREZ on telephone number 650-471-1115, posing as the CS's San Francisco narcotics trafficking partner. During their discussion[4], UC-1 introduced herself as a cocaine distributor in the San Francisco Bay Area and confirmed that she would meet with RAMIREZ in person on the upcoming Monday, November 16, 2020, in San Francisco. RAMIREZ agreed to the meeting and said that he would await for UC-1 to confirm the exact meeting location.

17. On November 15, 2020, UC-1 called RAMIREZ to request that they meet at 4:00

---

[3] It should be noted that the CS's communications with RAMIREZ occurred in Spanish. The CS summarized his/her communications with RAMIREZ, in English, to me and other agents.

[4] All UC communications referred to herein with RAMIREZ were recorded and conducted primarily in Spanish. All UC communications referred to herein with REUS were recorded and conducted primarily in English.

p.m. the following day.  RAMIREZ agreed.

18. On November 16, 2020, UC-1 contacted RAMIREZ by phone with the address for Best Buy at 1717 Harrison Street, San Francisco, as the meeting location. UC-1 reiterated that they would meet at 4:00 p.m. to discuss a cocaine purchase. RAMIREZ again agreed.

19. Just before the scheduled meet time, UC-1 contacted RAMIREZ advising she had arrived at the Best Buy parking lot and that she was looking for him. RAMIREZ told UC-1 that he had not arrived yet. In fact, surveillance agents had already identified RAMIREZ in the lot prior to UC-1's arrival. During this time, the CS advised surveillance agents that RAMIREZ had contacted the CS, sending pictures apparently taken by RAMIREZ, to the CS, of vehicles that RAMIREZ claimed belonged to law enforcement. Based on my training and experience, and conversations with senior agents, I know that it is common for drug traffickers to conduct counter-surveillance to avoid detection.

20. Shortly after arriving at Best Buy, UC-1 exited her vehicle and RAMIREZ waved UC-1 over to where he was standing. UC-1 approached him. On meeting in person, RAMIREZ introduced himself as "Armando." During their conversation, RAMIREZ asked UC-1 how everything was going (in apparent reference to the UC-1's involvement in selling cocaine). UC-1 explained that business was good, adding that she and her associate, a second DEA SA acting in an undercover capacity (hereafter "UC-2"), were headed to San Jose that evening to sell cocaine. UC-1 then offered to show RAMIREZ the cocaine if he was interested. RAMIREZ told UC-1 that he was interested, then clarified whether he could just see it or whether he have to purchase some. UC-1 told RAMIREZ that there was no obligation to purchase anything and reiterated that she was solely interested in showing him the type of product that she sold. RAMIREZ requested that they change their location before viewing the cocaine. RAMIREZ and UC-1 then separated.

21. RAMIREZ, from the Best Buy parking lot, then contacted the CS by phone and reiterated that he believed that he saw law enforcement vehicles in the area and wanted to change locations.

22.     A short while after, UC-1 contacted RAMIREZ by phone and told him they could meet across the street in the parking lot for Office Max, at 1750 Harrison Street San Francisco. UC-1 drove to that lot. UC-1 saw RAMIREZ walking across the street from Best Buy towards Office Max and began making conversation with RAMIREZ when he arrived.

23.     By arrangement, UC-2 was parked nearby in a vehicle that contained 10 kilograms of actual cocaine. UC-1 now called UC-2 to request he, UC-2, drive the cocaine to the Office Max lot to display to RAMIREZ. UC-2 drove into the Office Max lot and parked near UC-1's vehicle. UC-2 exited his vehicle, greeted RAMIREZ, and opened the vehicle's trunk. A duffle bag containing the ten kilograms of cocaine was located there. UC-2 unzipped the duffel bag revealing the ten kilograms of cocaine to RAMIREZ.

24.     UC-2 offered the opportunity for RAMIREZ to closely examine one kilogram of cocaine inside UC-2's vehicle. RAMIREZ asked UC-2 if any of the kilograms of cocaine were open. UC-2 stated they were not, but stated that he could open one for RAMIREZ. RAMIREZ confirmed he wanted UC-2 to open one of the packaged kilograms of cocaine. UC-2 cut a small opening into one of the packaged kilograms for RAMIREZ to inspect. RAMIREZ picked up some of the cocaine using one of his fingers and placed the cocaine onto the gum line of his mouth. UC-2 then zipped up the duffel bag, closed the trunk of his vehicle, and departed the area. In addition to the observation by UC-1 and UC-2, the display of the cocaine to RAMIREZ, and RAMIREZ's sampling of it, were captured by audio and video surveillance.

25.     UC-1 then told RAMIREZ to keep in touch and let her know if and when he would be interested in purchasing cocaine. RAMIREZ acknowledged the request and said that he would be in touch. Based on my training and experience and conversations with senior agents, I know it is common for experienced drug traffickers to want to personally sample narcotics before they purchase them. By requesting that he be allowed to sample the cocaine, I believe that RAMIREZ demonstrated his knowledge and experience in the drug trade.

26.     A couple of days later, RAMIREZ contacted the CS and advised him/her that he

was interested in conducting the cocaine transaction in a few weeks' time. Throughout the rest of November 2020, RAMIREZ remained in contact with the CS and UC-1.

27. On December 1, 2020, the CS advised agents including myself that RAMIREZ contacted him/her and stated that his "boss" was in the area. According to the CS, RAMIREZ told the CS that this "boss" wanted to examine the CS's cocaine and if he, the "boss," liked the product, the "boss" would purchase 3 to 6 kilograms of cocaine. The CS further explained to agents that RAMIREZ had advised him that his "boss" was the one who controlled the money for the cocaine. The CS stated to agents that he/she told RAMIREZ that he/she would not show RAMIREZ and his "boss" the cocaine, but that he/she was willing to conduct the originally agreed upon transaction of 5 kilograms of cocaine, for $33,000 per kilogram, so long as RAMIREZ and his "boss" displayed, to the CS or his/her agents, that they possessed the money for the cocaine before any cocaine would be exchanged. After continued negotiation, RAMIREZ agreed that he and his "boss" would purchase two kilograms of cocaine from the CS and his/her associate, UC-2, the following day, on December 2, 2020, between 11:30 a.m. and 12:30 p.m.

28. On December 2, 2020, the CS spoke with RAMIREZ and confirmed that RAMIREZ and his "boss" would purchase two kilograms of cocaine from the CS's associate, UC-2. At approximately 12:30 p.m., UC-2 contacted RAMIREZ and asked him to conduct the cocaine transaction at the parking deck located at 2300 16th Street in San Francisco. RAMIREZ told UC-2 that he would not go to that location because, RAMIREZ believed, there was law enforcement in that area. UC-2 and RAMIREZ ultimately settled on meeting at 500 South Airport Boulevard, in South San Francisco, at approximately 1:00 p.m. Based on my training and experience, and conversations with senior agents, I know that experienced drug traffickers will go to great lengths to evade law enforcement detection, as evidenced here by RAMIREZ's determination to avoid areas that he believed featured a significant police presence.

29. At approximately 1:00 p.m., UC-2 contacted RAMIREZ and confirmed that he, UC-2, was in the area of 500 South Airport Boulevard. UC-2 walked around the area on foot

looking for RAMIREZ. RAMIREZ advised UC-2 that he could see him and waved at UC-2 to come over to him on the sidewalk outside of 500 South Airport Boulevard. UC-2 walked over to RAMIREZ. They greeted one another outside of RAMIREZ's vehicle, a silver Chevrolet Traverse.

30. At this point, UC-2, while greeting RAMIREZ, observed REUS leaning against the side of the Chevrolet Traverse. RAMIREZ asked UC-2 if he had the cocaine on him. UC-2 replied that it was in his car across the street. REUS asked UC-2 why he had not brought the cocaine with him when he left his car.

31. UC-2 began to negotiate with RAMIREZ and REUS about seeing the money for the cocaine before bringing the cocaine over. UC-2 advised REUS and RAMIREZ that RAMIREZ had already sampled the cocaine when he, UC-2, showed it to RAMIREZ on November 16, 2020, which RAMIREZ confirmed. REUS countered that he, REUS, had not sampled the cocaine, and that he wanted to sample it if he, REUS, was going to purchase it.

32. RAMIREZ then told REUS to get the money to show to UC-2. REUS then walked out of sight, behind a box truck, and returned with a Dick's Sporting Goods brown paper bag. REUS showed UC-2 the inside of the bag, which contained a substantial amount of uncounted United States currency.[5] UC-2, after determining by visual inspection that the amount of money in the bag was sufficient to purchase kilogram quantities of cocaine, told RAMIREZ and REUS that he, UC-2, would retrieve the cocaine from his car across the street. UC-2, as he began to walk to his car, heard REUS say that he, REUS, would purchase 1 to 2 kilograms of cocaine and would want to purchase more kilograms in the future if the cocaine was of good quality.

33. Moments later, agents and officers arrived on scene to place RAMIREZ and REUS into custody. While RAMIREZ and REUS were being arrested, DEA Task Force Officer Joe Valiente, who was on scene, observed REUS throw the Dick's Sporting Goods brown paper

---

[5] DEA protocol provides that DEA Special Agents may not count seized money at the scene of operations. Instead, DEA agents must rely on official counts conducted by banking institutions. Agents will take the money seized in the operation on December 2, 2020, for an official count at a bank as soon as possible.

bag containing the United States currency under a white Audi sedan (later determined to be leased to REUS). As RAMIREZ and REUS were being arrested, UC-2 confirmed that they were the two individuals who had attempted to purchase the kilograms of cocaine from him.

34. The transaction described above was captured by audio and video surveillance.

## CONCLUSION

35. Based on the foregoing, I hereby assert that probable cause exists to believe that Jesus Ascencio RAMIREZ and Francisco Tomas REUS attempted to knowingly and intentionally possess with intent to distribute a controlled substance, namely, 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B)(ii)(II).

_/s Colin Hart_____
Colin Hart
Special Agent
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 3rd day of December 2020. This complaint and warrants are to be filed under seal.

_____
The Honorable Joseph C. Spero
United States Magistrate Judge